## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUIS BABECKI, MATTHEW CLEGG, and SASHA BAMBERG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE VALLEY HOSPITAL, THE BOARD OF TRUSTEES OF VALLEY HEALTH SYSTEM, THE VALLEY HOSPITAL INVESTMENT COMMITTEE – DEFINED CONTRIBUTION PLANS, and JOHN DOES 1-20,<br><br>Defendants. | )<br>)<br>)   **CIVIL ACTION NO.:**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs, Louis Babecki, Matthew Clegg, and Sasha Bamberg ("Plaintiffs"), by and through their attorneys, on behalf of the 401(k) Retirement Savings Plan for Employees of the Valley Hospital (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include The Valley Hospital ("Valley Hospital" or the "Company"), The Board of Trustees of Valley Health System ("Board") and the Valley Hospital Investment Committee – Defined Contribution Plans (the "Committee").

2.    The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Summary Plan Description for 401(k) Retirement Savings Plan for Employees of The Valley Hospital, April 15, 2022 ("SPD"), at 4 ("This Plan is a defined contribution plan, which is intended to qualify under Section 401(a) of the Internal Revenue Code"); *see also* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan established under section 401(k) of the Internal Revenue Code (the "Code") for the benefit of all non-union eligible employees of The Valley Hospital and Valley Health Medical Group and related employers (the "Company" or the "Employer"). The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B); *see also* SPD, at 20 ("ERISA imposes duties upon the people who are responsible for the operation of the Plan. These people, called 'fiduciaries,' have a duty to operate the Plan prudently and in the best interests of you, other Plan participants and beneficiaries."). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.      The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers."[2] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent.   In devising and implementing strategies for the investment and

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 25, 2025).

management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7. The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 25, 2025) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9. At all times during the Class Period, the Plan had over one-half billion dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $619,742,577 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

10. By 2024, the Plan had $1,059,210,825 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

11. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 6,583 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2024, the Plan had 7,960 participants. *See* 2024 Form 5500 for the Plan, at 2.

12. With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13. Specifically, Defendants allowed substantial assets in the Plan to be invested in a fixed annuity contract with The Lincoln National Life Insurance Company ("Lincoln National GIC"), a guaranteed investment contract ("GIC"). The Lincoln National GIC provided a significantly lower rate of return than other

5

comparable investments that Defendants could have made available to Plan participants.

14.    Lincoln National benefited significantly from Plan participants being invested in the Lincoln National GIC. The assets invested in the Lincoln National GIC were held and invested by Lincoln National, which kept the spread (the difference between the amount Lincoln National earned on the investments and the amount Lincoln National paid to Plan participants). The crediting rates that Lincoln National provided to investors in the Lincoln National GIC were/are so low that Lincoln National reaped a windfall on the spread.

15.    Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Lincoln National,[4] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Lincoln National GIC.

16.    The arrangements and transactions with Lincoln National are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

---

[4] "The fixed income annuity is managed by [Lincoln National Life Insurance Company]. Lincoln [Financial Group Trust Company, Inc.] is the trustee of the Plan and, therefore, these transactions qualify as party-in-interest transactions." Auditor's Report, attached to 2024 Form 5500, at 13.

17.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and their participants millions of dollars.

18.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violation of ERISA's prohibited transactions (Count III).

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20.    This Court has personal jurisdiction over Defendants because the Plan is administered in this District, meaning Valley Hospital transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

21.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Valley Hospital does business

in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### **Plaintiffs**

22.    Plaintiff, Louis Babecki ("Babecki"), resides in Monroe Township, New Jersey. During his employment, Plaintiff Babecki participated in the Plan and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Babecki specifically invested in the Lincoln National GIC during the Class Period. He suffered injury to his Plan account from the underperformance of the funds in the Plan.

23.    Plaintiff, Matthew Clegg ("Clegg"), resides in Pompton Plains, New Jersey. During his employment, Plaintiff Clegg participated in the Plan and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Clegg specifically invested in the Lincoln National GIC during the Class Period. He suffered injury to his Plan account from the underperformance of the funds in the Plan.

24.    Plaintiff, Sasha Bamberg ("Bamberg"), resides in Lodi, New Jersey. During her employment, Plaintiff Bamberg participated in the Plan and invested in the options offered by the Plan that are challenged in this lawsuit. Plaintiff Bamberg specifically invested in the Lincoln National GIC during the Class Period. She

suffered injury to her Plan account from the underperformance of the funds in the Plan.

25.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

26.    Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

## Defendants

### Company Defendant

27.    The Valley Hospital is the plan sponsor for the Plan and a Plan administrator with a principal place of business at 4 Valley Health Plaza, Paramus, New Jersey. *See* 2024 Form 5500 for the Plan, at 1-2; *see also* The Valley Hospital Nonstandardized Profit Sharing/401(k) Plan Adoption Agreement #001 ("Plan Doc."), at 2 (identifying The Valley Hospital as the Plan Administrator). "The Valley Hospital is a fully accredited, acute-care, not-for-profit hospital serving more than 440,000 people in 32 towns in Bergen County and adjoining communities."[5]

---

[5] *See* https://www.valleyhealth.com/valley-hospital (last accessed December 3, 2025).

28.     During the putative Class Period, the Company is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because it had control over Plan management and/or authority or control over management or disposition of Plan assets.

29.     According to the Plan documents, "Each member [of the Committee] serves at the discretion and will of the Board of Trustees of Valley Health System." Defined Contribution Plans Investment Policy Statement for Valley Health System, effective February 2024 ("IPS"), at 2.

30.     The Committee, through The Board of Trustees of Valley Health System, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.     Accordingly, Valley Hospital, during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

32.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

10

33.    Valley Hospital, acting through its Board of Trustees, appointed the Committee. Accordingly, like the Company, the Board had a concomitant fiduciary duty to monitor and supervise the Committee.

34.    Each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

35.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

36.    As discussed above, Valley Hospital appointed the Valley Hospital Investment Committee – Defined Contribution Plans to, among other things, ensure that the investments available to Plan participants are appropriate and performed well as compared to their peers.

37.    "The Committee is responsible for the investment oversight of Plan assets for the benefit of the participants." IPS, at 2.

38.    "As fiduciaries, the Committee members are responsible for selecting and monitoring the investment of the Plan's assets and making decisions concerning investment alternatives available under the Plan. In addition, the Committee shall act with the care, skill, prudence, and diligence under the circumstances that a

11

prudent investment professional, acting in like capacity and familiar with such matters, would use in the conduct of an enterprise." IPS, at 3.

39.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

40.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV.   CLASS ACTION ALLEGATIONS[6]

41.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the 401(k) Retirement Savings Plan for Employees of the Valley Hospital, at any time between December 18, 2019 through the date of judgment (the "Class Period").

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g., In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

42. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 for the Plan lists 7,960 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the Plan, at 2.

43. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan were being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

13

45.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

46.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

48.     "The Plan is a defined contribution plan established under section 401(k) of the Internal Revenue Code … for the benefit of all non-union eligible

14

employees of The Valley Hospital and Valley Health Medical Group and related employers." *See* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 7.

49.    "The Valley Hospital has adopted the 401(k) Retirement Savings Plan for Employees of The Valley Hospital (the "Plan") to help its employees save for retirement." SPD, at 1; *see also* IPS, at 2 ("The purpose of the Plan[] is to help provide eligible employees with long-term asset accumulation through a combination of employee and employer contributions to individual participant accounts and the earnings thereon to fund the retirement and other financial needs of Plan participants and their beneficiaries.").

### The Plan's Investments

50.    Per the IPS, "[t]he Committee has been appointed to oversee and administer the investment alternatives available under the Plans. For Plans subject to ERISA, the Committee shall discharge its responsibilities in accordance with ERISA's fiduciary standards and in the sole interest of the Plan's Participants." IPS, at 3. As will be discussed in more detail below, the Committee fell well short of these fiduciary expectations.

51.    Included in the Plan's available funds was a guaranteed interest contract – "a fully benefit-responsive fixed annuity contract with The Lincoln National Life Insurance Company." Auditor's Report, attached to 2024 Form 5500 for the Plan, at 12.

52.     At the end of 2019, $150,667,434 in Plan assets were invested in the Lincoln National GIC, representing 24.31% of the Plan's assets under management. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 12.

53.     At the end of 2024, over $123 million in Plan assets were invested in the Lincoln National GIC – representing 11.63% of the Plan's assets under management. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 15.

54.     The chart below demonstrates the amount of Plan assets invested in the Lincoln National GIC during the Class Period.

| Plan Year | Plan Assets in the Lincoln National GIC |
|---|---|
| 2019 | $150,667,434 |
| 2020 | $200,136,288 |
| 2021 | $208,938,275 |
| 2022 | $134,446,586 |
| 2023 | $131,902,421 |
| 2024 | $123,149,991 |

## VI.   THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.   ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

55.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

16

56.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

57.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

58.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

59.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

60.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

61.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

62.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

63.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

64.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of

ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Cir. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

65.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

66.     The Plan fiduciaries adopted an investment policy statement. As such, the fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, No. 21-cv-301, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

67.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

68.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on October 29, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA. By letter dated November 17, 2025, Valley Hospital denied the Plaintiffs' request for meeting minutes.

69.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

70.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

71.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Lincoln National GIC in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of underperformance.

## B.      Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Lincoln National GIC

72.     A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[9]

73.     Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[10]

74.     There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Lincoln National GIC; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

75.     "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength

---

[9] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[10] *Id.*

21

rating since an insurer's general account backs the guarantee that is at the core of this product."[11]

76.     As indicated above, the Plan was invested in a proprietary guaranteed investment fund managed by Lincoln National, the Lincoln National GIC.

77.     There are two significant problems with the Lincoln National GIC discussed below. First, the Lincoln National GIC is a traditional GIC and is structured as a general account, fixed annuity contract. As a general account product, the Lincoln National GIC thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

78.     The second related problem with the Lincoln National GIC is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

79.     The Lincoln National GIC's crediting rates were not commensurate with the level of risk for a traditional/general account GIC, and were not even as high as GICs with lower levels of risk such as separate account and synthetic GICs.

80.     Defendants' selection of the imprudent Lincoln National GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

---

[11] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

### 1.    The Plan's Inclusion of the Lincoln National GIC

81.    At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Lincoln National GIC.

82.    The Auditor's Report attached to the 2023 Form 5500 for the Plan state as follows:

> ***The Plan invests in a fully benefit-responsive fixed annuity contract with The Lincoln National Life Insurance Company ("LNLIC")***. LNLIC maintains the contributions in a general account, which is credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. ***LNLIC is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan.*** There are no reserves against contract value for credit risk of the contract issuer or otherwise.
>
> ***The crediting interest rate is based on a formula agreed upon with the issuer and which is reviewed on a quarterly basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date.***
>
> Certain events limit the ability of the Plan to transact at contract value with the issuer. Such events include the following: (1) amendments to the plan documents (including complete or partial plan termination or merger with another plan), (2) changes to plan's prohibition on competing investment options or deletion of equity wash provision, (3) bankruptcy of the plan sponsor or other plan sponsor events (for example, divestitures or spin-offs of a subsidiary) that causes a significant withdrawal from the plan, or (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA. ***The Plan administrator does not believe that the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable.***

23

Auditor's Reports attached to the 2024 Form 5500 for the Plan, at 12 (emphasis added).

83.    For these reasons, the Lincoln National GIC's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The Lincoln National GIC's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Lincoln National GIC, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

84.    Defendants' selection of the imprudent Lincoln National GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 2.    There are Many GICs in the Marketplace with Competitive Crediting Rates, Including GICs offered by Lincoln National

85.    The Plan's fiduciaries should not have selected or maintained the Lincoln National GIC.

86.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

87.     Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

88.     These comparisons include, for example:

- Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" investment contract, which "[c]redited rates are guaranteed for the duration of the guaranteed period elected by the Plan Sponsor, and do not vary with the subsequent performance of assets of the Company which back these guarantees." Auditor's Report, attached to 2023 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. Further, "[u]nder no event may the Company terminate this contract and settle at an amount different from the contract value." *Id*.

- The Shands Jacksonville Retirement Plan offers a traditional guaranteed investment contract with Variable Annuity Life Insurance Company ("VALIC"). Auditor's Report, attached to the 2023 Form 5500 for the Shands Jacksonville Retirement Plan, at 12. "The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan." *Id*. Like the Lincoln National GIC, "[t]he crediting rate is reviewed on a quarterly basis for resetting." *Id*. Further, the company states that "no events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

89.     The Lincoln National GIC in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[12] |
|------|-----------|---------------------|-------------|-------------------|--------------------|

---

[12] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

25

| 2019 | Ameritas 401(k) Retirement Plan | 3,600 | $629,709,023 | Ameritas Insurance Company | 3.64% |
|---|---|---|---|---|---|
| | Shands Jacksonville Retirement Plan | 6,066 | $292,193,093 | VALIC | 4.47% |
| | **Valley Hospital Plan** | **6,583** | **$619,742,577** | **Lincoln National** | **2.62%** |
| 2020 | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Insurance Company | 3.48% |
| | Shands Jacksonville Retirement Plan | 6,138 | $322,951,592 | VALIC | 4.33% |
| | **Valley Hospital Plan** | **7,167** | **$786,189,722** | **Lincoln National** | **2.40%** |
| 2021 | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Insurance Company | 3.43% |
| | Shands Jacksonville Retirement Plan | 6,218 | $371,794,130 | VALIC | 4.43% |
| | **Valley Hospital Plan** | **5,365** | **$886,013,526** | **Lincoln National** | **2.66%** |
| 2022 | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Insurance Company | 3.30% |
| | Shands Jacksonville Retirement Plan | 6,782 | $343,252,624 | VALIC | 4.30% |
| | **Valley Hospital Plan** | **8,262** | **$794,441,178** | **Lincoln National** | **2.43%** |
| 2023 | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Insurance Company | 3.66% |
| | Shands Jacksonville Retirement Plan | 7,204 | $396,147,444 | VALIC | 4.31% |
| | **Valley Hospital Plan** | **6,487** | **$930,511,014** | **Lincoln National** | **2.07%** |

90.    Throughout the Class Period, the Lincoln National GIC in the Plan and the underperformed the comparator funds by over 38 percent, as demonstrated in the table below.

26

| Year | Lincoln National GIC Rate of Return in the Plan | Comparator Average Rate of Return | Lincoln National GIC Percentage of Underperformance in the Plan |
|------|---|---|---|
| 2019 | 2.62% | 4.06% | 35.47% |
| 2020 | 2.40% | 3.91% | 38.62% |
| 2021 | 2.66% | 3.93% | 32.32% |
| 2022 | 2.43% | 3.80% | 36.05% |
| 2023 | 2.07% | 3.99% | 48.12% |
| Average Underperformance during Class Period | | | 38.12% |

91.     The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Lincoln National GIC's dismal crediting rate.

92.     Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Lincoln National GIC.

93.     In short, because the Plan held between $600 million and $1 billion in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

94.     Additionally, the Plan's Lincoln National GIC underperformed other traditional guaranteed investment contracts, with similar characteristics as the

27

Lincoln National GIC, during the Class Period, including some that were backed by

Lincoln National Insurance Company, as demonstrated in the table below:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[13] |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Valley Hospital Plan** | **6,583** | **$619,742,577** | **Lincoln National** | **2.62%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |

[13] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Valley Hospital Plan** | **7,167** | **$786,189,722** | **Lincoln National** | **2.40%** |
| | | | | | |
| 2021 | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | **Valley Hospital Plan** | **5,365** | **$886,013,526** | **Lincoln National** | **2.66%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |

| | | | | | |
|---|---|---|---|---|---|
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Valley Hospital Plan** | **8,262** | **$794,441,178** | **Lincoln National** | **2.43%** |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Valley Hospital Plan** | **6,487** | **$930,511,014** | **Lincoln National** | **2.07%** |

95.    A prudent fiduciary would have known that other providers of GICs offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments.

96.    By selecting the Lincoln National GIC with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments without needing to take on more risk.

97.    With the significant amount of assets under management in the Lincoln National GIC, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[14]

98.    The Lincoln National GIC in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans:

## VII.    ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

99.    Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

---

[14] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

(A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

. . .

(C)    furnishing of goods, services, or facilities between the plan and a party in interest;

(D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

100.    Section 1106(b) further provides, in pertinent part:

A fiduciary with respect to the plan shall not –

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

101.    During the Class Period, Defendants allowed Plan assets to be invested in the Lincoln National GIC that performed poorly when compared to other investments that were available, and knowing that Lincoln National, or its affiliates, were/are offering recordkeeping and trustee services to the Plan.

102.    As an alternative to investing Plan assets in the Lincoln National GIC, the Plan could have invested assets in better performing investments with the same

32

investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Lincoln National.

103. Defendants did not prudently and objectively evaluate the Lincoln National GIC in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Lincoln National GIC in order to benefit Lincoln National and its affiliates.

104. The Plan's sizeable investment in the Lincoln National GIC provided Lincoln National a substantial amount of compensation at the expense of Plan participants.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committee)

105. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

106. At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

107. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of

33

Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

108.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

109.   As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Lincoln National GIC, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

110.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

111.  The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company and the Board)

112.  Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

113.  The Company and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

114.  In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

115.  The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company and/or the Board.

35

116.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

117.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

118.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**PROHIBITED TRANSACTION**
**(against all Defendants)**

119.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in

interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

121.   Defendants were at all times fiduciaries to the Plan.

122.   ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

123.   Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Lincoln National.

124.   Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Lincoln National and the Plan.

125.   When Defendants caused the Plan to engage in the annuity transaction, Lincoln National was a party in interest, including because Lincoln National, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

126. These transactions occurred each time the Plan paid fees to Lincoln National in connection with the Plan's investments in the Lincoln National GIC and other proprietary options that paid revenue sharing to Lincoln National.

127. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits

the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: December 18, 2025                    Respectfully submitted,

                                            */s/ Mark K Gyandoh*
                                            Mark K. Gyandoh, Esquire
                                            NJ Atty ID. 025622001
                                            James A. Maro, Esquire
                                            NJ Atty ID. 017052000
                                            **CAPOZZI ADLER, P.C.**
                                            312 Old Lancaster Road
                                            Merion Station, PA 19066
                                            Email: markg@capozziadler.com
                                                     jamesm@capozziadler.com
                                            Tel.: (610) 890-0200
                                            Fax: (717) 232-3080

                                            *Counsel for Plaintiffs and the Putative Class*